# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v.  ) | No. 4:19 CR 362 RWS / DDN |
| ) | |
| HERBERT MILLER, JR., ) | |
| ) | |
| Defendant. ) | |

## ORDER AND RECOMMENDATION

Before the court are the pretrial motions of the parties that were referred to the undersigned United States Magistrate Judge under 28 U.S.C. §636(b).  The motions pending before the Court are those by defendant Herbert Miller, Jr., to suppress evidence (Docs. 15 and 23) and by the United States for a determination by the Court of the admissibility or not of any arguably suppressible evidence (Doc. 16).  An evidentiary hearing was held on September 18, 2019.

Upon consideration of the evidence adduced during the hearing and the arguments of counsel, the undersigned makes the following findings of fact and conclusions of law:

## FACTS

1.  On April 25, 2019, during the afternoon, Metropolitan St. Louis Police Officer Matthew Tesereau was in a marked police car on patrol with Officers Michael Flatley and Chad Cross in the Penrose neighborhood of the City of St. Louis.  At that time Tesereau was a member of the SWAT team of officers assigned to patrol the high crime areas of the City, which included the Penrose neighborhood.[1]  All three officers were then

---

[1] Other duties of the SWAT team then included participating in the execution of federal and state search warrants, performing the former duties of the no-longer extant Police

in uniform. By that time in his career, Officer Tesereau had participated in many traffic stops. The police vehicle used on this date did not have a dash camera.

2.     Officer Tesereau drove the police vehicle, with the other officers as passengers, south on Fair Avenue toward Penrose Street. As he drove the police car south toward Penrose, Tesereau clearly observed a red Chevrolet Monte Carlo automobile being driven north on Fair, make a left turn in view of the police onto westbound Penrose without using a turn signal. When he arrived at the intersection of Fair and Penrose, Tesereau looked west on Penrose and saw that the Monte Carlo had already almost reached Redbud Avenue two blocks to the west. To travel that far in such a short period of time, he believed from his experience that the auto had to have been driven at a high rate of speed in an effort to elude the officers. In coming to this conclusion, Officer Tesereau did not use any speedometer or other device to monitor the speed of the Monte Carlo.

3.     Officer Tesereau then saw the red Monte Carlo turn right onto Redbud, again without using the turn signal. Still believing the red Monte Carlo was eluding the police car, Officer Tesereau quickly drove west to Redbud. When he got to Redbud, Tesereau saw the red vehicle on Redbud, again without its signal being used, pull to the curb and park behind a vehicle about three-fourths down the block,[2] in front of but a short distance south of 4258 Redbud. *See* Gov. Exs. A (map) and B (photo). Up to this point, neither the police vehicle's emergency lights nor its siren had been used. Tesereau waited for the red Monte Carlo to finish parking. He then pulled the police car immediately behind it. After he did so, Officer Tesereau activated the emergency lights and the air horn siren to get the attention of the driver.[3] Because the Monte Carlo was now parked right behind another

---

Department's Mobile Reserve, and aiding the regular patrol officers in patrolling the high crime areas of St. Louis.

[2] In his experience, Officer Tesereau had seen vehicles in similar circumstances pull to the curb in an effort to falsely indicate that that was where the drivers lived.

[3] Officer Tesereau identified defendant Herbert Miller, Jr., in the courtroom as the driver of the red Monte Carlo automobile in this traffic stop of April 25, 2019.

vehicle, the officers knew it could not then easily be driven away from them. The driver remained in the vehicle.

4.      Next, from his driver's seat in the police car, Officer Tesereau saw the driver of the Monte Carlo make a frantic, quick move with his right shoulder up and down towards the center console and driver's seat area of the vehicle.[4] Tesereau did not see any object that the driver might have been handling. Tesereau told the other officers about these movements of the driver in the vehicle.

5.      Officer Tesereau immediately got out of the police car and walked to the driver's side door of the Monte Carlo. The other officers also got out of the police vehicle and positioned themselves on the passenger's side of the Monte Carlo to provide cover or protection for Tesereau. At the driver's window, Tesereau told the driver the reason for the stop, *i.e.* the turns the car made without the required signals. The driver immediately apologized. He said he had just gotten off work and was trying to get home. Officer Tesereau asked the driver for his license and insurance, which were produced. He also showed the officer his St. Louis City Forestry Department employment identification. During the conversation, Tesereau saw the driver's heart pounding, even under his shirt; he saw that the driver's neck vein was pulsing heavily; and, as the driver handed his driver's license to the officer, Tesereau saw that his hands were shaking. After receiving the driver's license and insurance document, Officer Tesereau got back into the police vehicle. The other two officers remained where they were stationed as cover officers, while Tesereau ran the license.

6.      In the police vehicle, officer Tesereau conducted a computer enquiry about the driver, identified as Herbert Miller, Jr. The computer enquiry reported that Miller had a lengthy violent history, that he had no active warrant, and that he was then on federal supervision for weapons offenses. At this time, Officer Tesereau knew that the 4200 to 4500 blocks of Redbud is a very violent area; he had made many arrests in this area for

---

[4] From his experience, Officer Tesereau then believed these movements indicated the possibility that the driver was concealing a weapon.

state and federal gun and drug law violations; and he knew there had been many gangs feuding and retaliating there.

7. After receiving the computer report, Officer Tesereau returned to the red Monte Carlo and told the officers he was going to ask the driver to step out of the vehicle. Tesereau asked Miller to step out of the vehicle and he did so. Tesereau had Miller step to the rear of the Monte Carlo.

8. Next, Officer Tesereau orally advised Miller of his constitutional rights to remain silent and to counsel. Miller acknowledged and stated he understood these rights. Miller did understand these rights. Tesereau told Miller about the furtive movements he made in the vehicle. Tesereau stated to Miller that, based on Miller's history of being a convicted felon then on supervision for a weapons offense, he believed Miller had concealed a firearm in the vehicle. At this time, Miller was not in handcuffs and none of the officers had drawn a firearm. Tesereau then asked Miller if there was a gun in the car. In response, Miller slowly put his head down and stated a slow, "Yes," then quickly said, "No. There's no gun in my car. Why are you stopping me? Why did you pull me over?" This conversation was loud enough for the other officers to hear.

9. Next, Officer Flatley went to the driver's door of the Monte Carlo, opened it, and in the center console located and seized a loaded semi-automatic Glock .45 caliber handgun. Flatley returned with the gun in his hand to where Tesereau was standing with Miller. Officer Tesereau immediately placed Miller under arrest and he told Miller it was for unlawfully possessing a firearm as a felon. Without being expressly asked a question about whether the gun was his, Miller immediately stated that the vehicle and the gun were not his. Miller was placed in the police vehicle with Officer Flatley. Tesereau saw persons standing on the porch of the nearby residence at 4258 Redbud. He learned they were family members of Miller. As a courtesy, Tesereau then told them why Miller had been arrested and why he had been pulled over.

10. Because the red Monto Carlo had been driven by Miller who was then under arrest, the officers had the car towed and impounded, even though it was parked very near Miller's residence with family members around. Later, Officer Tesereau searched the

- 4 -

impounded Monte Carlo and found and seized Miller's registration and title receipt for the vehicle; contrary to Miller's earlier assertion, these documents indicated the vehicle belonged to Miller.  *See* Gov. Ex. D.

11.     Officer Tesereau issued three uniform traffic citations to Miller for the three failures to signal.  *See* Gov. Ex. C.

## DISCUSSION

Defendant has moved to suppress the physical evidence seized by the officers and his statements.  The issues indicated by the facts are discussed seriatim.

### (1)  The traffic stop

The initial stop of defendant driving his automobile was lawful under the Fourth Amendment.  The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized.

U. S. CONST. amend IV.  Under the Fourth Amendment, an officer who observes a traffic violation, even a minor one, has reasonable grounds to initiate a traffic stop.  *Rodriguez v. United States*, 135 S.Ct. 1609, 1614 (2015).  The authority of an officer following the initiation of the traffic stop is limited.

> A seizure for a traffic violation justifies a police investigation of that violation.  A relatively brief encounter, a routine traffic stop is more analogous to a so-called *Terry* stop than to a formal arrest.  Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission--to address the traffic violation that warranted the stop.  Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose.  Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed.

. . .

> Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Rodriguez*, 135 S. Ct. at 1614-15 (internal quotation marks and citations omitted). In defendant Miller's case, the police saw the driver of the Monte Carlo fail to signal turns on three occasions in the short distance the officers observed the vehicle. Each time the vehicle turned to the right or to the left without signaling was a violation of the Missouri State Traffic Code. *See* Mo. Rev. Stat. § 304.019. Thus, there were reasonable grounds to stop the Monte Carlo and to investigate the traffic law violations. Having observed these three traffic law violations, the officer was authorized to obtain defendant's driver's license and proof of insurance, which he did, and to check for outstanding warrants. His investigation went further, however.

It is not disputed that Officer Tesereau's investigation exceeded defendant's failure to signal the turns. He also investigated whether defendant could lawfully possess a firearm. He did so, because he had seen defendant move his body surreptitiously inside the vehicle in a way that, to the officer's reasonable belief, involved the hiding of a firearm. When only engaged in the investigation of the failures to signal, when he was at the driver's window, he also observed defendant act in a very noticeably nervous way. The officer saw that defendant's heart was pounding and his hands were shaking. Relevant to these facts, the Supreme Court continued its discussion in *Rodriguez* of the parameters of a lawful investigation after the reason for the traffic stop ended:

> In both [*Illinois v. Caballes*, 543 U.S. 405 (2007), and *Arizona v. Johnson*, 555 U.S. 323 (2009),] we concluded that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention. In *Caballes*, however, we cautioned that a traffic stop can become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket. And we repeated the admonition in *Johnson*: The seizure remains lawful only so long as unrelated inquiries do

- 6 -

>not measurably extend the duration of the stop.  An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop.  But, contrary to Justice Alito's suggestion, he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.

*Id.* at 1614-15 (internal quotation marks and citations omitted).

Defendant Miller argues that as soon as Officer Tesereau learned defendant had no outstanding arrest warrant, there was no constitutional basis for investigating him further.  The Court disagrees.  While that fact might play an important role in determining another case, in this case Officer Tesereau had other, substantial reasons to believe defendant was then engaged in criminal activity by illegally possessing a firearm.  Officer Tesereau believed that defendant drove the Monte Carlo sufficiently fast on Penrose Street to indicate that the driver was trying to elude the police.  He also saw defendant move his body in a manner that indicated he was then moving a firearm; he observed defendant interact with him in a noticeably very nervous manner; he learned that defendant had past experience with firearms; and he learned that, if defendant had a firearm in the Monte Carlo, he was doing so illegally.  These facts were constitutionally sufficient to support the officer's further investigation of whether he was then illegally possessing a firearm.  *United States v. Martinez-Cortes*, 566 F.3d 767, 771 (8th Cir. 2009) (holding that furtive actions, including movement of vehicle driver "as if to hide something between his leg and the car's console," justified further investigation of traffic stop).

Defendant also argues that his perceived nervousness and actions reasonably occurred and did not indicate criminal activity, because he had just parked in front of his residence, a police car had pulled in behind him and immediately activated its lights and siren.  Whatever the merits of this argument, generally or in other cases, the relevant circumstances of defendant's case are broader.  The perceived fast driving speed, the furtive movements, and his very noticeable nervousness preceded the officer learning of defendant's criminal history and his prior involvement with weapons.  In this context, it is reasonable for an experienced officer to suspect the subject's nervousness came from anxiety over whether he would be discovered with the firearm he then had.

The further investigation of whether defendant had a firearm inside the Monte Carlo reasonably included the police having defendant step out of the vehicle, which he did. This was reasonably necessary, because if the officer's reasonable suspicion that there was a firearm in the vehicle was true, the dangerous situation continued. Having defendant step out of the vehicle greatly lessened his ability to use or conceal the firearm.

### (2)  Defendant's statements outside the vehicle

In the reasonable extension of the traffic stop into an investigation of whether the Monte Carlo contained a firearm, Officer Tesereau spoke with defendant at the rear of the vehicle. Generally, custodial police interrogation of an individual must be preceded by the police advising the subject of his or her constitutional rights to remain silent and to counsel, as prescribed by *Miranda v. Arizona*, 384 U.S. 436 (1966). The government does not argue that defendant was not in police custody at the rear of the Monte Carlo or that Officer Tesereau did not interrogate him there, such that constitutional interrogation of him had to comport with the requirements of *Miranda.*

*Miranda* requires law enforcement officers, before interrogation, to inform an arrested person (1) that he has the right to remain silent, (2) that his statements may be used against him at trial, (3) that he has the right to be represented by an attorney being present during an interrogation, and (4) that, if he cannot afford to hire an attorney, one will be appointed for him. 384 U.S. at 444, 479. Defendant does not dispute that he was advised of his *Miranda* rights.

It is incumbent upon the government to establish that, when answering the officer's questions, the subject knowingly and voluntarily waived the *Miranda* rights. *North Carolina v. Butler*, 441 U.S. 369, 373, 375-76 (1979). Defendant does not dispute he knew and waived his *Miranda* rights and answered the officer's question about whether there was a firearm in the Monte Carlo.

Similarly, it is not disputed that defendant's statements at the rear of the vehicle were voluntary. They were not the result of government overreaching, such as coercion, deception, or intimidation. *Colorado v. Connelly*, 479 U.S. 157, 170 (1986); *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (citing *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)). In fact, the voluntary nature of defendant's statements is indicated by the fact that as soon as he uttered "Yes," he changed his statement and denied there was a gun in the Monte Carlo and asked why he had been stopped.

### (3) The search of the Monte Carlo at scene of the stop

Defendant argues the search of the Monte Carlo and the seizure of the firearm at the scene of the stop were unconstitutional. This was not a search of the vehicle incident to defendant's arrest, *e.g., Arizona v. Gant*, 556 U.S. 332 (2009), because he had not yet been formally arrested. Rather, this was a warrantless search of the Monte Carlo that, to be constitutional, had to be based upon the police having probable cause to believe the vehicle contained a firearm.

Police may search a vehicle without a warrant, if they have probable cause to believe the vehicle contains contraband or evidence of criminal activity. *Carroll v. United States*, 267 U.S. 132, 158-59 (1925) (after holding that a search of a vehicle may lawfully be had without a warrant, stating "The right to search and the validity of the seizure . . . are dependent on the reasonable cause of the seizing officer has for belief that the content of the automobile offend against the law."); *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (stating, "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more.").

Probable cause means "a fair probability that contraband or evidence of a crime will be found in a particular place," given the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In defendant's case, during the extension of the investigation, at the rear of the Monte Carlo, with defendant not handcuffed, Officer Tesereau asked defendant whether there was a gun in the car. Defendant answered, "Yes." Even though

defendant quickly recanted this statement, the affirmative answer gave the officers probable cause to believe that defendant, known by the police to have been convicted of a felony offense, unlawfully had a firearm inside his car.

### (3) Defendant's arrest

Similarly, probable cause to arrest without a warrant lawfully exists when the police have information sufficient to cause a reasonable person to believe that the defendant had committed an offense or was then committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The same information that supported the probable cause to search the Monte Carlo, plus the seizure of the firearm from the Monte Carlo, was legally sufficient to support defendant's arrest on the scene for the unlawful possession of the handgun found in the Monte Carlo.

### (4) Defendant's post-arrest statements

There is no dispute that after the police seized the firearm from the vehicle defendant made a statement denying that the firearm and the vehicle were his. This statement was volunteered by defendant, *i.e.*, he made the statement without it being an answer to a question by the police. Volunteered statements, made spontaneously and not in response to a question, are not subject to the prophylactic requirements of *Miranda*. *See Miranda*, 384 U.S. at 478; s*ee also United States v. Hawkins*, 102 F.3d 973, 975 (8th Cir. 1996), *cert. denied*, 520 U.S. 1179 (1997); *Butzin v. Wood*, 886 F.2d 1016, 1018 (8th Cir. 1989), *cert. denied*, 496 U.S. 909 (1990).

Even assuming the post-arrest statement was an expected response to the police showing defendant the seized firearm, *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) (ruling the *Miranda* safeguards apply when a subject "in custody is subjected to either express questioning or its functional equivalent"), and thus was interrogation for *Miranda* purposes, the statement should not be suppressed. This is for the same reasons set forth above for the constitutional admissibility of defendant's admission that he had a gun in the

Monte Carlo. He had been advised of his *Miranda* rights. He understood them. Defendant knowingly waived his rights when he made the statement.

Defendant's statements should not be suppressed.

### (5) The second search of the vehicle

Rather than leave the Monte Carlo at the scene of the stop, after defendant was arrested and removed from the scene, the car was impounded by the police, towed away, and was subjected to a warrantless search. The vehicle could have been left in the custody of family members at the scene, which the police then knew was near defendant's residence. The expressed purpose for this search was to look for evidence that countered defendant's statement that the car was not his.

To sustain the constitutionality of this second search, away from the scene of the arrest, as an inventory search following the arrest of the driver, the government had to establish that its interests outweighed defendant's reasonable expectation of privacy in the property. *See Colorado v. Bertine*, 479 U.S. 367, 372 (1987). The interests of the police that are furthered by an inventory search are (1) the protection of the property in its possession; (2) the protection of the police from false claims that the property was stolen, lost, or damaged; and (3) the protection of the police from danger from the property in its possession. *Id.* at 369-70.

The government bears the burden of establishing that the inventory search was reasonable under the totality of the circumstances. *United States v. Taylor*, 636 F.3d 461, 463-64 (8th Cir. 2011). To be reasonable under the Fourth Amendment, the inventory search must not be a mere subterfuge for a general search for incriminating evidence. *Florida v. Wells*, 495 U.S. 1, 4 (1990). Also, the search must be conducted according to the police department's standard procedures. *See Colorado v. Bertine*, 479 U.S. at 375-76; *United States v. Taylor*, 636 F.3d at 464; *United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998) (ruling that searching behind a door panel was not pursuant to the standard police procedure).

During the hearing, the government did not establish that the second search of the Monte Carlo was a lawful inventory search. The two documents seized during this search should be suppressed as evidence.

## CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that the oral motion of the United States for a determination of the admissibility or not of any arguably suppressible evidence (Doc. 16) **is denied** as mooted by the proceedings held on the defendant's motions to suppress.

**IT IS HEREBY RECOMMENDED** that the motions of defendant Herbert Miller, Jr., to suppress evidence (Docs. 15 and 23) **be denied, except that Government Exhibit D, the documents seized during the second search of the Monte Carlo, should be suppressed.**

The parties have 14 days to file written objections to this Order and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

At the direction of the District Judge,

**IT IS HEREBY ORDERED** that this case is set for **a jury trial on February 3, 2020, at 9:00 a.m.**

                                             /s/ David D. Noce  
                                  **UNITED STATES MAGISTRATE JUDGE**

Signed on December 4, 2019.